**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**CHARLES W. AND AMY W. BAKER**                                              **Plaintiffs**

**v.**                                              Civil Action No. 1:08cv649-LTS-RHW

**NATIONWIDE MUTUAL FIRE INSURANCE**                                     **Defendant**
**COMPANY**

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO STRIKE THE EXPERT REPORT AND TESTIMONY OF TED L. BIDDY**

In this case, Plaintiffs' sole designated expert witness plans to testify that all of Plaintiffs' property damage — even damage to property and contents below the visible, undisputed four foot waterline inside this house — was actually caused by wind. Ted Biddy speculates that 125 mph winds blew Plaintiffs' house off its allegedly elevated piers and lowered the house's elevation by several feet. According to Biddy, because of this supposed drop in elevation, Plaintiffs' property was subjected to storm surge flooding that otherwise would have barely reached it.

Biddy's familiar "solely by wind" mantra bears no relation to the evidence of what actually occurred at Plaintiffs' house. Plaintiffs' home survived Hurricane Katrina, and was only torn down months after the storm when Plaintiffs decided to build a new, larger house. Biddy's proffered prediction of what *might have occurred* to this structure fails to account in any meaningful way to the real evidence — photographs and testimony from Plaintiffs' witnesses — about what *actually occurred* to the structure that survived Hurricane Katrina. It would be inappropriate for a jury to hear Biddy's post-hoc speculation about a chain of events that might have happened, because even Plaintiffs' own witnesses will testify that this chain of events ***did not actually occur at the property.***

At the outset, no 125 mph 3-second wind gust ever occurred at this property. So Biddy's assumption that it did rests on a false meteorological predicate to which he is not competent to testify, and his opinion should be stricken on this basis alone. Furthermore, Biddy based his entire theory on an elevation certificate that Biddy failed to recognize was prepared for Plaintiffs' new house, an elevated structure that was built several feet higher over the ground level than their old house and, thus, did not reflect the elevation of Plaintiffs' house as it existed during Hurricane Katrina. The reality is that Plaintiffs' house actually remained at the same elevation during Hurricane Katrina. And Biddy's theorizing a several foot drop in elevation — so as to opine that wind was the "root cause" of the four feet of water in this home — is nothing more than fantasy.

Unlike Biddy, Nationwide actually inspected Plaintiffs' still-standing house shortly after Hurricane Katrina and paid Plaintiffs $4,856.53 for minor wind damage. And, after this, Plaintiffs decided to demolish their home and build a new one based on the advice of two contractors. Yet, even the testimony of Plaintiffs' own contractors does not support Biddy's elevation-drop theory. Thus, Biddy's "expert" prediction of what *might have* occurred during Hurricane Katrina amounts to nothing more than speculation that is refuted by the evidence of this particular case. As such, Biddy's opinion must be excluded because it does nothing to "assist the trier of fact to understand the evidence or to determine a fact in issue," Federal Rule of Evidence 702, and can only serve to confuse the jury. Fed.R.Evid. 403. It is precisely where proffered opinions "would not be helpful, and indeed would only serve to confuse the jury," that this Court must exercise its role to strike such testimony. *Daubert v. Merrell Dow Pharms., Inc.* 43 F.3d 1311, 1321 (9th Cir. 1995*)*.

In addition to his fanciful assumptions about imaginary structural damage, Biddy reaches beyond his expertise to give meteorological opinions that he is not qualified to provide. Because

Biddy candidly acknowledges that he lacks any training or expertise in meteorology, and because he has not been offered as an expert in this area, Biddy's meteorological opinions are precluded by *Daubert*.  Biddy's opinions on reconstruction cost must also be stricken, as they employ the same flawed methodology that this Court has repeatedly rejected.  Because none of the opinions offered by Biddy can withstand *Daubert* scrutiny, this Court should exercise its gate-keeping authority to protect Nationwide from his unreliable and irrelevant testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

## STANDARD OF REVIEW

Before parties may proffer opinion testimony in a federal court, each opinion is subjected to an exacting test.  Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical, or other specialized knowledge **will assist the trier of fact** to understand the evidence or to determine a fact in issue, a witness qualified as an expert by **knowledge, skill, experience, training, or education**, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon **sufficient facts or data**, (2) the testimony is the product of **reliable principles and methods**, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.[1]  This rule imparts upon district courts "a gatekeeping role to ensure that scientific testimony is both reliable and relevant." *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999), citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). This role requires a district judge to: (1) "determine whether the proffered testimony is reliable, requiring an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid," and (2) "determine whether that reasoning or methodology can be properly applied to the facts in issue; that is, whether it is relevant." *Id.,* citing *Daubert*, 509 U.S. at 592-93.  "Under *Daubert*, 'any step that renders the analysis unreliable . . . **renders the expert's testimony inadmissible.  This is true whether the step completely changes a reliable**

---

[1]    Emphasis added unless otherwise indicated.

*methodology or merely misapplies that methodology.'" Id.* at 670-71 (italics emphasis in original) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3rd Cir. 1994)).

Further, the proponent of expert testimony has the burden of showing admissibility by a preponderance of the evidence. *See Daubert,* 509 U.S. at 593 n.10. Because Plaintiffs cannot show by a preponderance of the evidence that Biddy satisfies the *Daubert* requirements for any of his opinions, his report and testimony must be excluded.

## ARGUMENT

**I. BIDDY'S OPINIONS ON STRUCTURAL DAMAGE ARE INADMISSIBLE BECAUSE THEY ARE BASED ON ASSUMPTIONS THAT ARE UNSUBSTANTIATED OR ERRONEOUS.**

Biddy's primary opinion in this case is that the Bakers' property fell from a height of 16 feet above sea level to a position where Hurricane Katrina's storm surge flooding could reach it. According to Biddy, but for the "shift and fall" that occurred before the storm surge got there, the property would not have been damaged by the water:

> The entire house was moved slightly off its foundations by the early winds of the storm, and most all of the foundation piers and many of the floor support beams were destroyed. Much of the floor system fell down to the ground level. Secondly, the later arriving storm waters at 11 AM flowed under the house and came up a maximum of 3.5 to 4 feet of water above the lowered floor level and caused destruction of most items touched by the salt water.
>
> * * *
>
> The storm's high water did no structural damage to this building and **would not have entered the building except in seepage areas, without the earlier winds blowing the structure slightly to the northwest and destroying the foundations and floor support beams and lowering the floor level**. It would have been impossible for the storm's waters to have moved the house and to have caused the destruction of the foundations and floor support system, because the original floor level elevation was at 16 feet while the high water level was only at elevation 17 to 18 feet.

(Apr. 11, 2007 Forensic Eng'g Study of Damages by Ted L. Biddy at 0000015-16 ("Biddy Report") (Ex. 1).) Biddy's reasoning can be summed up in a simple chain of speculation: *if* a

4

125 mph 3-second wind gust did in fact pass through the Plaintiffs' property, and *if* a 125 mph 3-second wind gust moved Plaintiffs' property from its foundational piers, **then**, all of the ensuing flood damage can be attributed to wind.  (*See* Biddy Report at 0000030, opinions G, H, L.)

But, for Biddy's opinion to be admissible, his underlying assumptions must be reliable. *See Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (affirming the district court's decision to exclude an expert where it found her report "to be unreliable because she had based it on a false assumption").  Here, Biddy's assumptions and his conclusions are either unsubstantiated or demonstrably false.

A.    **There Is No Reliable Evidence That The Wind Speeds At Plaintiffs' Property Were At Or Above 125 Miles Per Hour.**

Biddy's opinion that the Plaintiffs' house was destroyed by wind is based on his claim that wind at a speed of 125 mph or greater did in fact pass over Plaintiffs' residence.  The only reliable meteorological evidence in this case is that the maximum 1-minute sustained wind speed at Plaintiffs' property was 80 mph and the maximum 3-second gust was 105 mph.  *(See* May 1, 2009 KKAI Meteorological Analysis of Hurricane Katrina Wind and Storm Tide ("KKAI Report") (Ex. 2).)  Biddy has absolutely no formal training in meteorology that would qualify him to render any meteorological opinion of his own, much less to counter the opinion of a trained meteorologist.   Because the core premise of Biddy's causation opinion is wholly unreliable, his conclusions based on this assumption must also fail *Daubert* scrutiny.  *See Curtis*, 174 F.3d at 670 ("Under *Daubert*, '(a)ny step that renders the analysis unreliable ... *renders the expert's testimony inadmissible*'") (quoting *In re Paoli*, 35 F.3d at 745).

While an expert is "permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him," the 125 mph wind speed used in Biddy's calculations has not come from a reliable source, but from Biddy himself.  *Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, Civil Action No. 06-4262, 2009 WL 2356292, at *2 (E.D.

5

La. July 28, 2009) (internal quotations & citation omitted).  Plaintiffs have not designated a meteorology expert, and no one but Biddy has been identified to testify as to the wind speed at the Baker property during Hurricane Katrina.  Instead, Biddy arbitrarily arrived at the 125 mph used in his calculations by simply using "the median of the wind speeds reported by AccuWeather" for the area.  (*See* Biddy Report at 000007-8; Mar. 1, 2010 Deposition of Ted L. Biddy at 160-61 (Ex. 3).)  A trained meteorologist would have looked to the anemometer less than a mile and half from the Bakers' property, evaluated data from this collection point, and reached a very different conclusion from Biddy.  (*Cf.* KKAI Report at 9-10 (reaching a conclusion that the maximum sustained wind speed at the Baker site was 80 mph and the maximum 3-second gust was 105 mph based in part on anemometer readings from Ingalls Shipyard).)  Given his lack of expertise in meteorology, Biddy's oversimplistic averaging of weather data is an unreliable methodology that he was not qualified to undertake, and the results are meaningless.  Without any expertise in meteorology it is impossible for Biddy to arrive at a reliable wind speed estimate.  He himself admitted that he could only reach a "guestimate" on shielding, one variable that affects wind speeds.  (Biddy Dep. at 176.)  But, wind speed is a determining factor in Biddy's conclusion on the amount of damage to Plaintiffs' property caused by wind.  (*Id.* at 162.)  Because the underlying assumption of his causation calculation is unreliable, Biddy's opinions on structural damage also fail to pass *Daubert* muster.

  **B. Biddy's Speculation About Plaintiffs' Home "Falling" To "Ground Level" Is Irrelevant Because It Is Inconsistent With The Facts Of This Case.**

  Biddy's speculations about the wind damage to Plaintiffs' property are supported by little more than his own *ipse dixit* and a selective smattering of Plaintiffs' testimony.  Because Plaintiffs leveled their house before retaining Biddy, his "inspection and investigation were limited to observations of the remaining property and surrounding areas; interviews with Mr. Baker; and the study of after storm photographs which Mr. Baker furnished." (Biddy Report at

0000013.) Because Plaintiffs destroyed the main piece of evidence in this case – their house as it existed after Hurricane Katrina – Biddy was left to base his opinion on his own false assumptions and selectively disregard facts that were inconvenient to his theory.

Biddy's elevation-drop theory rests on the assumption that the pre-storm elevation of the Plaintiffs' residence was 16 feet, an error that even Biddy has now acknowledged. Biddy erroneously based his conclusions on an elevation certificate that was prepared *after Hurricane Katrina from construction drawings of the Plaintiffs' new house*. (*See* Biddy Dep. at 201-202; May 3, 2006 Elevation Certificate (Ex. 4).) He incorrectly assumed that the elevation of the new house was the same as the elevation of the house demolished by Plaintiffs. (*See* Biddy Dep. at 201.)

In fact, the new construction is significantly higher. While Plaintiffs' new home sits elevated several feet in the air, their old home did not:

**Pre-Katrina Home:**          **Post-Katrina Home:**

(*See* Pre-Storm Nationwide Photographs of Baker Residence at NW-BAKC0003163-67 (Ex. 5); Apr. 23, 2009 Residential Hurricane Damage Evaluation by James A. Skees ("Skees Report") at Attachment A (Ex. 6).) Biddy's theory was that a house elevated as high as Plaintiffs' new post-Katrina house was blown down to the elevation level that their pre-Katrina house already occupied. When shown a picture of the newly constructed Baker residence, even Biddy was forced to admit that the new construction was "[c]onsiderably higher" than the structure that

7

existed at the time of Hurricane Katrina. (Biddy Dep. at 203; Enlargement of Pre-Storm Photographs of Baker Residence at NW-BAKC0003163 (Ex. 7).) So Biddy was forced to admit that relying on the post-storm elevation caused his report to contain calculation errors. (Biddy Dep. at 205.) Finally, when Biddy was shown photos comparing Plaintiffs' pre-storm house as it was before Katrina and as it was damaged after Katrina, **_Biddy himself could find nothing in those photos to support his theory that the elevation of Plaintiffs' property changed during Hurricane Katrina_**. (_See id._ at 226-228; _compare_ Enlargement of Pre-Storm Photographs of Baker Residence at NW-BAKC0003163 _with_ Sept. 29, 2005 Nationwide Photograph at NW-BAKC000153 (Ex. 8).)

Biddy's elevation drop theory flies in the face of all the direct evidence about what actually happened to Plaintiffs' property. None of the witnesses who actually saw this property before it was torn down testified that the property's elevation changed after Hurricane Katrina. In an interview after Hurricane Katrina, Charles Baker described his home as being constructed "above the ground about a foot and a half," to explain why there was a four and a half foot waterline inside the house and a six foot waterline on the exterior of his house. (Oct. 8, 2008 All Activity Logs at #NW-BAKC000098 (Ex. 9).) Jack Rogers, who Plaintiffs claim advised them that their property needed to be rebuilt, went into the crawlspace under Plaintiffs' house to examine this property. (Dec. 15, 2009 Deposition of Jack Rogers at 54 (Ex. 10).) David Usury, Plaintiffs' other witness to the property damage to their home, also failed to describe any changes to the elevation of the structure after Hurricane Katrina. (_See_ Feb. 25, 2010 Deposition of David Usury at 25-26 (Ex. 11).) There is simply nothing to support Biddy's notion that wind "caused the floor of the house to be lowered to the ground, which allowed the later arriving storm waters to enter the house and cause water damage inside." (Biddy Report at 000020.)

Stripped of the elevation certificate he erroneously cited, and in the face of this contradictory evidence, Biddy relies on the later statement of Mr. Baker that his home "seemed lower" after Katrina to support the theory that the elevation of the house changed. But, despite the fact that Biddy's opinion is based almost entirely on the say-so of Mr. Baker, Biddy only selectively listens even to this source. For example, Mr. Baker admitted to Biddy that "there was six feet of water at his property, and the house was two feet off the ground, so it was four feet inside." (Biddy Dep. at 191.) The only explanation for Baker's admission is that the house was still standing on its two foot foundation when the storm surge arrived — the difference between the height of the exterior water line and the interior water line would be two feet of piers. On the other hand, these numbers are illogical if, as Biddy concluded, the house had been blown off its piers and was sitting on ground level at the time the storm surge arrived. (Biddy Report at 0000004-5.) If Biddy's conclusions were true, the flood line would be at the same height inside and outside the home. He himself admits, but makes no effort to explain this discrepancy:

> Q.   Where does the six feet come from?
> A.   I don't know. I have no idea why he said six feet. He said four feet inside, so the part of the house that fell down, three and a half, four feet.
> Q.   You just disregarded the six feet?
> A.   It doesn't fit to anything. He's a layman. He said the depth of the water in the house, four feet maximum. Well, three and a half would fit. ***Talking about six feet on the outside would not come close to fitting***.

(Biddy Dep. at 197.) In fact, Biddy never even looked at the photographs showing the water line at the Baker property. (*See id.* at 190.) All he can do to address this flaw in his theory is point to the fact that Baker is just a "layman," and, thus, presumably incapable of estimating the number of feet between the ground and a line on the outside of his home. Without a credible explanation for the six foot water line on the outside of the Baker residence, Biddy chooses instead to ignore his only source in formulating his conclusions.

The Supreme Court held in *Kumho Tire* that "'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Biddy's speculations about the wind blowing Plaintiffs' residence to the ground are based in nothing but his own *ipse dixit*. His elevation-drop theory of what might have happened simply does not relate to the actual direct evidence of property damage that occurred in this case. Therefore, Biddy's opinions are irrelevant to the facts of this case and must be excluded under *Daubert* and the Federal Rules of Evidence.

C.    **Biddy May Not Opine That The Plaintiffs' Residence Was Destroyed Entirely By Wind Because Their MDA Application Is Tantamount To A Judicial Admission That Their Home Was Damaged At Least In Part By Flood.**

It is undisputed that Plaintiffs' residence suffered some amount of wind damage during Hurricane Katrina, but Biddy's report takes the extreme position that "the root cause of ***all*** of the structural destruction of the Baker house, detached garage, and property trees was the early winds of Hurricane Katrina." (Biddy Report at 0000030.) Biddy does not even consider the possibility that the storm surge could have done damage to the Baker residence in the absence of wind, finding instead that "[n]o water would have entered the house except for seepage leaks if the building had not been moved by the winds." (*Id.*) Based on this theory, Biddy concludes that Nationwide is liable to Plaintiffs for the full reconstruction cost of their residence. (*Id.* at 0000028.)

Not only is this theory contradicted by the available evidence, it is also prohibited by the Plaintiffs' judicial admission that at least part of the damage to their property was caused by flood. On November 7, 2006, Plaintiffs applied for the Mississippi Development Authority ("MDA") Flood Elevation Grant Program. (*See* Nov. 7, 2006 MDA Flood Elevation Grant

10

Program Application (Ex. 12).)  In this application, Plaintiffs certified that they met all of the program criteria, including that "[t]he home received flood damage as a result of Hurricane Katrina."  (*Id.*)  They signed that statement having certified that "all information on the application, documents provided and closing documents are true to best of [applicant's] knowledge and … have been relied on by MDA to provide disaster assistance," that "(a)ll damages claimed were a direct result of the declared disaster," and that they could "be prosecuted by Federal, State and/or local authorities for making or filing false, misleading and/or incomplete statements and/or documents."  (Nov. 7, 2006 MDA Grant Agreement (Ex. 13).)  Based on these representations, Plaintiffs received payments from the MDA in December 2006 and again in February 2009 totaling $129,155.58.  (*See* Dec. 7, 2006 State of Mississippi Check No. 010004446 (Ex. 14); Feb. 9, 2009 State of Mississippi Check No. 011115952 (Ex. 15).)

This Court has held that because "[t]he purpose of the [MDA flood] grant is to provide financial assistance to homeowners who ... received flood damage to their home," and because "a homeowner must certify that his property sustained flood damage," it is well settled that "by applying for and receiving an MDA grant the homeowner makes a judicial admission that the insured property has sustained some amount of flood damage." *Dickinson v. Nationwide Mut. Fire Ins. Co.*, No. 1:06CV198-LTS-RHW, 2008 WL 941783, *6, *7 (S.D. Miss. Apr. 4, 2008); *see Letoha v. Nationwide Ins. Co.*, No. 1:06CV1009-LTS-RHW, 2007 WL 2059991, *2 (S.D. Miss. July 12, 2007) (holding that by accepting insurance proceeds, insurance claimants make "a judicial admission that the insured property sustained flood damage at least equal to the flood insurance benefits [they] accept[]").

Plaintiffs represented to the Mississippi Development Authority that they were eligible for the Flood Elevation Grant Program because their home sustained flood damage during Hurricane Katrina, (*see* MDA Application); thereafter, they accepted nearly $130,000 in flood

grant funds to build a new home (significantly more than the $89,600 for which it was insured). They now inconsistently sue Nationwide for their **entire reconstruction cost** based on a theory that their home was **entirely destroyed by wind**. Plaintiffs are estopped from making this claim because their acceptance of the MDA flood grant constitutes a judicial admission that at least part of the damage to their home was caused by flood. Further, they may not circumvent this Court's holding by presenting the theory of sole wind causation through their expert. *See Dickinson v. Nationwide Mut. Fire Ins. Co.*, No. 1:06CV198-LTS-RHW, 2008 WL 2568140, *1 (S.D. Miss. June 24, 2008) (precluding Biddy from testifying to opinion of sole wind causation where Plaintiffs had made binding admission of some flood damage). Therefore, Biddy may not testify that the Plaintiffs' residence was destroyed entirely by wind.

Biddy's conclusion that wind, and wind alone, caused all of Plaintiffs' property damage must be stricken. First and foremost, it rests on an inexpert meteorological exaggeration of the wind speeds that existed at this property. Further, Biddy's post-hoc speculation about what occurred at the Plaintiffs' property (1) was based on an elevation certificate that is entirely inapplicable, (2) ignores all of the contemporaneous evidence about what actually happened to this standing structure, (3) relies on only portions of Baker's testimony that are convenient to the theory; and (4) contravenes the admissions of Plaintiffs to the MDA. Because Biddy's conclusions are based on false assumptions, unsubstantiated facts, and outright erroneous facts which are connected to the case at hand by no more than his *ipse dixit*, his opinion must be excluded under *Daubert*.

## II. BIDDY'S TESTIMONY ON WEATHER CONDITIONS AT PLAINTIFFS' PROPERTY IS NOT ADMISSIBLE BECAUSE HE IS NEITHER QUALIFIED NOR OFFERED AS AN EXPERT IN METEOROLOGY.

Despite his lack of training in meteorology and Plaintiffs' failure to designate him as a meteorology expert, Biddy submitted a report replete with meteorological conclusions well

beyond his expertise.  In his report, Biddy took the liberty of opining about Hurricane Katrina's wind speeds, water levels, and the timing of the maximum winds and highest waters.  (*See, e.g.*, Biddy Report at 0000002, 3, 7, 8, 9.)   Indeed, in summarizing his opinions, Biddy lists six separate opinions about the meteorological conditions at Plaintiffs' property during Hurricane Katrina, (*id.* at 0000029, opinions A-F), including his opinion that 125 mph reflects a "conservative" estimate of the maximum 3-second wind gusts at Plaintiffs' property.  (*Id.* at opinion E.)

This is clearly outside of Biddy's area of expertise.  Biddy recognizes that these opinions are meteorological conclusions drawn by him, despite the fact that he did not perform any "meteorology work" to reach those conclusions.  (Biddy Dep. at 40 ("So far as determining what the wind velocities were or the sequence of wind velocities, what the height of the water was and when it occurred, I did not do the meteorology work for that, but I determined what it was from many experts").)   Biddy's curriculum vitae is completely devoid of any knowledge, skill, experience, training, or education on the subject of meteorology. (*See* Ted L. Biddy Curriculum Vitae ("C.V.") (Ex. 16).)  He does not list "meteorology" as one of his "fields of competence." (*Id.* at 1.)   Further, Biddy has readily admitted to his lack of qualification to reach his own meteorological opinions.  (Biddy Dep. at 40 ("Q: You are not a trained meteorologist, are you? A: No, Of course not."); *see id.* at 37 (admitting that he is not certified as a meteorologist and has no degree in meteorology); *id.* at 43 (Q: Do you hold yourself out as a meteorologist?  ... A: No, I do not.).)  Indeed, Biddy succinctly put it, "I'm not a meteorologist and don't do meteorology work."  (*Id.* at 56.)  This should hardly surprise Plaintiffs, who do not even attempt to offer Biddy as an expert in this area.   (*See* Feb. 11, 2009 Pls. Designation of Expert Witnesses ¶1 (Dkt. 8).)

Biddy's apparent and admitted lack of expertise in the field cannot be disguised by his inclusion of meteorological data compiled from other sources, such as the National Oceanic and Atmospheric Administration ("NOAA"), the National Weather Service ("NWS"), and AccuWeather, Inc. (*See* Biddy Report at 0000002-7.)  Biddy's use of these reports to provide opinions about structural engineering cannot help him pass *Daubert* scrutiny and does not authorize him to parrot the meteorological conclusions of others because he "applies no expertise" to this data.  *See Ross v. Metropolitan Prop. & Cas. Ins. Co.*, No. 1:07CV521-LTS-RHW, 2008 WL 4793807, *2 (S.D. Miss. Nov. 3, 2008); *see also Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613-15 (7th Cir. 2002) (upholding trial court's exclusion of expert whose ultimate opinion was based on a computer model even though he himself was not an expert in computer modeling and was not competent to judge whether the modelers had made scientifically correct choices because they "exercise[d] professional judgment that [was] beyond the expert's ken").  Given his lack of expertise, Biddy's conclusions based on the NOAA, NWS, and AccuWeather data are no more reliable than the conclusions of any other lay person who reads the same and picks a wind speed or water level at whim.  Courts in this Circuit have agreed with Judge Posner's opinion in *Dura Automotive* that "[a] scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty." *Id.* at 614; *see also Fowler v. United States*, No. 08-216, 2009 WL 2827958, *9 (W.D. La. Sept. 1, 2009); *Imperial Trading Co., Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 06-4262, 2009 WL 2356292, *4 (E.D. La. July 28, 2009).  This is precisely what Biddy's recital of meteorological data seeks to do.  It is impermissible under the standards of Federal Rule of Evidence 702.

Because Plaintiffs cannot show by a preponderance of the evidence that Biddy has the requisite knowledge, skill, experience, training, or education in meteorology, his opinions in this area are prohibited by Rule 702 and *Daubert*.

III.   **BIDDY MAY NOT OFFER OPINIONS ON COST ESTIMATING OF RECONSTRUCTION BECAUSE HIS METHODOLOGY FAILS TO MEET *DAUBERT* STANDARDS OF RELIABILITY.**

Biddy also offers inadmissible expert testimony by attempting to estimate cost to reconstruct the pre-storm value of Plaintiffs' property.  In his report, Biddy includes a "Cost Estimate of Reconstruction" section which uses the R.S. Means published 2007 Residential Cost Data to estimate the cost of reconstructing the Plaintiffs' residence.  (*See* Biddy Report at 0000027-28.)  Using this data, Biddy arrived at a base cost of $140,610, to which he added $43,667 for "garage repairs, porch, deck, appliances, and other costs." (*Id.*)  The base cost was calculated solely with R.S. Means data in Biddy's report, and the report provided no explanation whatsoever as to how Biddy arrived at the figure for the ancillary costs.  (*See id.*)

This Court has previously rejected use of this very methodology by Biddy in other cases. *See St. Charles Condo. Homeowner's Ass'n, Inc. v. Landmark Am. Ins. Co.*, No. 1:06CV632-HSO-RHW, Docket No. 78 (S.D. Miss. Aug. 30, 2007); *see also Sanders v. Nationwide Mut. Fire Ins. Co.*, No. 1:07CV998-LTS-RHW, 2008 WL 5095992 (S.D. Miss. Nov. 24, 2008); *Dickinson v. Nationwide Mut. Fire Ins. Co.*, No. 1:06CV198-LTS-RHW, 2008 WL 2568139, *2 (S.D. Miss June 24, 2008).  In *Landmark*, Judge Ozerden explained:

> [R]egarding the rebuild estimate, ***Mr. Biddy's report, according to his testimony, is based primarily on the publication referred to as the R.S. Means, which I think by Mr. Biddy's own acknowledgement, as well as the publication's own acknowledgement, is not the most accurate way of calculating a rebuild cost.***  In fact, the text of the publication includes the comment that it is not the most accurate way or even an accurate way to project the final rebuild cost of a project. Biddy's rebuild estimate is based heavily, if not entirely, on that publication, and the Court finds that it and ***Mr. Biddy's opinions and qualifications on a question of a rebuild estimate do not possess sufficient indicia of intellectual and scientific rigor, as the catch words are used in Daubert***, and it is certainly not meant in any way to question Mr. Biddy's intellectual rigor, but simply to point out that ***his qualifications, his report, and his testimony, are not sufficient to carry and pass Daubert on the question of a rebuild estimate.***

15

(Aug. 29, 2007 Transcript of Daubert Hearing at 204, *St. Charles Condo. Homeowner's Ass'n. Inc., v. Landmark Am. Ins. Co.*, No. 1:06CV632-HSO-RHW (S.D. Miss.) (Ex. 17). This ruling was based in Biddy's own frank admissions that the use of R.S. Means data is not the most accurate way to prepare a cost estimate. Dec. 11, 2007 Deposition of Ted Biddy at 138, Dickinson v. Nationwide Mut. Fire Ins. Co., No 1:06CV198-LTS-RHW (S.D. Miss.) (Q: The R.S. Means booklet actually says don't use this to estimate rebuilding costs, correct? A: It says ***it's for preliminary cost estimate only.***) (Ex. 18).

In this case, Biddy used the exact same methodology that the *Landmark* Court rejected.

Q:  . . . [Y]ou quit using the R.[S]. Means cost data manual?
A:  That's correct, because Judge Ozerden said it was not accurate enough.
Q:  Which [methodology] did you use in regard to the Baker property?
A:  I did use the R.S. Means, because it was before Judge Ozerden's ruling. I have not made a subsequent estimate based on the local builder's quotes.
Q:  But you understand the data you included in the report [for the Baker property] has been ruled inadmissible by the Southern District of Mississippi?
A:  I do, yes.

(Biddy Dep. at 49-50.) In short, despite this Court's previous repudiation of Biddy's method of reconstruction cost calculation, Biddy again employed this same method to arrive at a cost estimate of Plaintiffs' property, and he has failed to perform a subsequent estimate for the Plaintiffs employing a different methodology. (*See id.* at 50).

If Biddy's use of R.S. Means data is recognized as an unreliable method for arriving at cost-estimating opinions, his methodology for arriving at an estimate for "garage repairs, porch, deck, appliances, and other costs" is missing altogether. For these costs, which are not included in the R.S. Means data calculations, Biddy provides no explanation or calculation methodology whatsoever. (Biddy Report at 0000027-28.) This unsubstantiated estimate constitutes no more than "subjective belief or unsupported speculation," and is clearly prohibited by *Daubert* and its progeny. *See Daubert v. Merrill Daw Pharms., Inc.*, 509 U.S. 579, 590 (1993); *see also Brown v.*

16

*Miska*, 96 F.3d 1445, 1445 (5th Cir. 1996) (per curiam) (holding that where "proffered expert testimony [is] premised on specious, questionable, and unscientific methodology," it may not be admitted as evidence). To reach any other conclusion would result in the anomaly that Biddy would be prohibited from testifying to opinions reached through an unsound methodology, but allowed to testify as to opinions that are grounded in no methodology at all.

This Court correctly held in *Landmark* that Biddy's reconstruction cost methodology using R.S. Means data wholly lacks the necessary level of reliability required by *Daubert*. Since his cost estimate opinions in this case employed the same methodology, the Court's ruling in *Landmark* extends with equal force to the present case. The Court must exercise its gate-keeping function once again, and exclude Biddy from providing any testimony or evidence regarding his R.S. Means based estimate of the cost of reconstructing the Plaintiffs' property.

## CONCLUSION

Biddy does not meet the reliability and relevancy requirements imposed by *Daubert* and Rule 702 of the Federal Rules of Evidence because his causation opinions are based on unsubstantiated or erroneous facts, he is not qualified to give meteorological opinions, and his reconstruction cost calculations are based on unreliable methodology, as this Court and Biddy himself have recognized. Therefore, Nationwide respectfully requests this Court to exclude the report and testimony of Ted L. Biddy.

This the 22nd day of March, 2010.

Respectfully submitted,

NATIONWIDE MUTUAL FIRE INSURANCE
COMPANY, Defendant

By Its Attorneys,
WATKINS LUDLAM WINTER & STENNIS P.A.

By:  */s/ F. Hall Bailey*
     F. Hall Bailey
     hbailey@watkinsludlam.com

H. Mitchell Cowan (MSB No.7734)
Laura Limerick Gibbes (MSB No. 8905)
F. Hall Bailey (MSB No. 1688)
Janet McMurtray (MSB No. 2774)
Christopher R. Shaw (MSB No. 100393)
Laura L. Hill (MSB No. 102247)
WATKINS LUDLAM WINTER & STENNIS, P.A.
190 East Capitol Street, Suite 800 (39201)
Post Office Box 427
Jackson, MS  39205
Telephone: (601) 949-4900
Facsimile: (601) 949-4804


Of Counsel:
Daniel F. Attridge, P.C. (Bar No. 44644)
Thomas A. Clare, P.C. (Bar No. 44718)
Christian D.H. Schultz (Bar No. 44747)
Robert B. Gilmore (Bar No. 44997)
KIRKLAND & ELLIS LLP
655 Fifteenth St., NW
Washington, DC  20005
(202) 879-5000 (Telephone)
(202) 879-5200 (Facsimile)

3151429.1/09446.31680

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing with the Clerk of the

Court using the ECF system which sent notification of such filing to the following:

>Charles R. McRae
>P.O. Box 33
>Jackson, MS 39205
>601-906-1008
>Email: crmcrae@bellsouth.net

This the 22nd day of March, 2010.

By:    /s/ F. Hall Bailey
F. Hall Bailey
hbailey@watkinsludlam.com
