**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**CHARLES W. AND AMY W. BAKER**  **PLAINTIFFS**

**v.**  **Civil Action No. 1:08cv649-LTS-RHW**

**NATIONWIDE MUTUAL FIRE INSURANCE**  **DEFENDANT**
**COMPANY**


**MEMORANDUM OF AUTHORITIES IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


H. Mitchell Cowan (MSB No.7734)
Laura Limerick Gibbes (MSB No. 8905)
F. Hall Bailey (MSB No. 1688)
Janet D. McMurtray (MSB No. 2774)
Christopher R. Shaw (MSB No. 100393)
Laura L. Hill (MSB No. 102247)
WATKINS LUDLAM WINTER & STENNIS, P.A.
190 East Capitol Street, Suite 800 (39201)
Post Office Box 427
Jackson, MS  39205
Telephone: (601) 949-4900
Facsimile: (601) 949-4804

*Attorneys for Defendants Nationwide Mutual Fire*
*Insurance Company*

Of Counsel:
Daniel F. Attridge, P.C. (Bar No. 44644)
Christian D. H. Schultz (Bar No. 44747)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC  20005
(202) 879-5000 (Telephone)
(202) 879-5200 (Facsimile)

## ABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................3

ARGUMENT ........................................................................................................9

I.     Plaintiffs Are Not Entitled to Coverage For Uncompensated Property Damage
       Under Their Homeowner's Insurance Policy. .................................................10

       A.    There is No Evidence of Wind Damage To Plaintiffs' Property Beyond the
             $4,856.53 They Received. ...................................................................10

       B.    Plaintiffs Are Not Entitled To Coverage For "Other Structures" Under
             Coverage B....................................................................................18

       C.    Plaintiffs Are Not Entitled To Coverage Or Recovery For "Personal
             Property" Under Coverage C. ..............................................................18

       D.    Plaintiffs Are Not Entitled To Coverage Or Recovery For "Additional
             Living Expenses" Under Coverage D.....................................................19

II.    Plaintiff's Claims for Fraudulent Inducement Are Deficient And Time-Barred As
       A Matter Of Law..............................................................................21

III.   Plaintiffs Are Not Entitled to Punitive Damages. ..............................................23

       A.    Plaintiffs Bear A "Heavy Burden" In Substantiating Claims For Bad Faith
             and Punitive Damages.........................................................................23

       B.    Nationwide Was Not Reckless, And Did Not Act Intentionally Or With
             Bad Faith Regarding Plaintiffs' Rights In Adjusting Plaintiffs' Claim.................25

CONCLUSION....................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Bankers' Ins. Co. of Fla. v. Wells*,
    819 So. 2d 1196 (Miss. 2001) (en banc) ........................................................................ 23

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ......................................................................................................... 9

*Andrus v. Ellis*,
    887 So. 2d 175 (Miss. 2004) .......................................................................................... 22

*Atlas Roofing Mfg. Co. v. Robinson & Julienne, Inc.*,
    279 So. 2d 625 (Miss. 1973) ...................................................................................... 21, 22

*Blue Cross & Blue Shield of Miss., Inc. v. Campbell*,
    466 So. 2d 833 (Miss. 1984) .......................................................................................... 24

*Broussard v. State Farm Fire & Cas. Co.*,
    523 F.3d 618 (5th Cir. 2008) ...................................................................................... 24, 25

*Campbell v. State Farm Fire & Cas. Co.*,
    No. 1:07CV395-LTS-RHW, 2008 WL 2389746 (S.D. Miss. June 10, 2008) ...... 22, 23, 27

*Carter v. Citigroup Inc.*,
    938 So. 2d 809 (Miss. 2006) .......................................................................................... 22

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ......................................................................................................... 9

*Cherry v. Anthony, Gibbs, Sage*,
    501 So. 2d 416 (Miss. 1987) .......................................................................................... 26

*Corban v. United Services Auto. Ass'n.*,
    20 So. 3d 601 (Miss. 2009) ............................................................................................ 12

*Dauro v. Allstate Ins. Co.*,
    No. 1:00CV138RO, 2003 WL 22225579 (S.D. Miss. Sept. 17, 2003),
    *aff'd*, 114 Fed. App'x 130 (5th Cir. 2004) ................................................................... 24

*Dickinson v. Nationwide Mut. Fire Ins. Co.*,
    No. 1:06CV198-LTS-RHW, 2008 WL 2568140 (S.D. Miss. Jun. 24, 2008) ............. 17, 20

*Dickinson v. Nationwide Mut. Fire Ins. Co.*,
    No. 1:06CV198-LTS-RHW, 2008 WL 941783 (S.D. Miss Apr. 4, 2008) ...................... 17

*Eason v. Thaler*,
    73 F.3d 1322 (5th Cir. 1996) ........................................................................................ 9

*Forsyth v. Barr*,
    19 F.3d 1527 (5th Cir. 1994) ........................................................................................ 9

*Gibson v. Markel Int'l, Ltd.*,
    No. 1:07CV1245HSO-JMR, 2008 WL 3842977 (S.D. Miss. Aug. 14, 2008) ................ 22

*Gunn v. Lexington Ins. Co.*,
    No. 1:07CV478, 2008 WL 2039543 (S.D. Miss. May 12, 2008) .................................... 25

*Hutton v. American Gen. Life & Accident Ins. Co.*,
    909 So. 2d 87, 95 (Miss. Ct. App. 2005) ...................................................................... 22

*Legacy Condos, Inc. v. Landmark Am. Ins. Co.*,
    No. 1:06CV1108-KS-MTP, 2008 WL 80373 (S.D. Miss. Jan. 4, 2008) ................... 25, 27

*Leonard v. Nationwide Mut. Ins. Co.*,
    438 F. Supp. 2d 684 (S.D. Miss. 2006), aff'd., 199F.3d 419 (5th Cir. 2007),
    *cert. denied*, 128 S.Ct. 1873 (2008) ................................................................ 12, 13, 19

*Leonard v. Nationwide Mutual Insurance Co.*,
    499 F.3d 419 (5th Cir. 2007) .................................................................................. 21, 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)....................................................................................................... 9

*Murphree v. Federal Ins. Co.*,
    707 So. 2d 523 (Miss. 1997)................................................................................... 24, 27

*Pilate v. American Federated Ins. Co.*,
    865 So. 2d 387 (Miss. Ct. App. 2004) .......................................................................... 26

*Ragas v. Tenn. Gas Pipeline Co.*,
    136 F.3d 455 (5th Cir. 1998) ..................................................................................... 9, 20

*Reed v. American Med. Sec. Group, Inc.*,
    324 F. Supp. 2d 798 (S.D. Miss. 2004)......................................................................... 22

*Remel v. State Farm Fire & Cas. Co.*,
    No. 1:07cv126 LTS-RHW (S.D. Miss.) ......................................................................... 10

*Schmermund v. Nationwide Mutual Ins. Co.*, No. 1:07CV1213-LTS-RHW, 2008 WL
    5169396
    (S.D. Miss. Dec. 5, 2008)............................................................................................. 17

*Sentinel Indus. Contracting Corp. v. Kimmins Indus. Serv. Corp.*,
    743 So. 2d 954 (Miss. 1999)........................................................................................ 24

*Smith v. Nationwide Ins. Co.*, No. 1:08CV683-LTS-RHW,
    2009 WL 736199, at *3
    (S.D. Miss Mar. 18, 2009) ............................................................................................. 22

*Weathers v. Metropolitan Life Ins. Co.*,
    14 So. 3d 688 (Miss. 2009) ........................................................................................... 22

*Young v. Southern Farm Bureau Life Ins., Co.*,
    592 So. 2d 103 (Miss. 1991) (en banc) ........................................................................ 22

16429911-7

## INTRODUCTION

On August 29, 2005, Plaintiffs Charles and Amy Baker's house in Pascagoula, Mississippi survived Hurricane Katrina, but sustained significant flood damage below an undisputed four-foot waterline that was visible on the interior of their property. In the aftermath of that storm, Nationwide Mutual Fire Insurance Company ("Nationwide") inspected this property and issued a $4,856.53 payment for damage to Plaintiffs' roof and ceilings caused by wind and wind-driven rain.

In late October or November 2005, contractors tore up Plaintiffs' floors and looked under their house and advised Plaintiffs that it would cost too much to repair the house and that they should build a new house instead. Plaintiffs chose to do so and, in April or May of 2006, their existing house was removed. They never asked Nationwide to examine the foundation damage that prompted this decision. Instead, Plaintiffs told the Mississippi Development Authority, under oath, that their home "received flood damage as a result of Hurricane Katrina" to obtain $129,155.47 in flood disaster relief (far more than the $89,600 for which their home was insured). (Nov. 7, 2006 MDA Grant Application (Ex.1).)

After they build a new house, Plaintiffs filed a lawsuit against Nationwide telling a much different story. Plaintiffs claimed that their "home and personal property therein were completely destroyed by an accidental direct physical loss caused by winds." (Aug. 26, 2008 Complaint ¶ 12 [Dkt. 1].) Plaintiffs retained an expert, Ted Biddy, to testify that all of their property damage — even property damage below the visible, undisputed four-foot waterline — was actually attributable to wind. Biddy theorized that Hurricane Katrina winds blew Plaintiffs' home off of elevated piers and that the elevation of Plaintiffs' house dropped by several feet. Thus, according to Biddy, Plaintiffs' property, at this lowered elevation, was subjected to storm surge flooding that otherwise would have barely reached it.

Plaintiffs' claims must be rejected as a matter of law because their litigation "wind first" "elevation drop" theory bears no relation to the evidence of what actually occurred on this property during Hurricane Katrina.  Biddy's theory was mistakenly premised on an elevation certificate that Plaintiffs prepared for their new house — a house that was elevated much higher than Plaintiffs' house that weathered Hurricane Katrina.  In fact, Biddy himself acknowledged this error and recognized that the elevation certificate he cited does nothing to support the "elevation drop" theory he espoused.  Moreover, when shown pre-storm and post-storm photographs of the house that survived Katrina, Biddy could identify nothing that would support a claim that the elevation changed during Hurricane Katrina.

Without this "elevation drop" theory, the four-foot waterline demonstrates where four feet of storm surge flooding caused damage to Plaintiffs' home and contents.  There is no evidence from which a reasonable, fair-minded jury could conclude that it was *wind damage* that caused Plaintiffs to build a new, larger house.  The contractors who examined Plaintiffs' house after the storm and advised them to build a new house did not express any opinion about the cause of the damage they reported.  If anything, they said the exact opposite.  Plaintiffs' contractor described the damage he saw as necessitating new construction as "floor joists and stuff" that "might have been some of them twisted a little bit" and explained that "that can happen with age or it can happen with getting wet and not drying out properly."  (Dec. 15, 2009 Deposition of Jack Rogers at 54 (Ex. 2).)

Nationwide correctly adjusted Plaintiffs' claim under the clear and unambiguous terms of its policy, paying for covered losses and denying coverage for flood damage under the plain and unambiguous terms excluding coverage for storm surge flooding.  Plaintiffs' claims must be dismissed as a matter of law.

## BACKGROUND

Plaintiffs Charles and Amy Baker purchased a residence at 1106 Shepherd Street, Pascagoula, MS 39567 in August 1998.  (Feb. 22, 2010 Deposition of Amy Baker at 27 (Ex. 3).) Plaintiffs obtained a standard homeowner's insurance policy through Nationwide that contained a standard flood exclusion, approved by the Mississippi Department of Insurance, and used for decades by Nationwide and other insurance carriers in Mississippi:

> ### Property Exclusions (Section I)
>
> 1.    We do not cover loss to any property resulting directly or indirectly from any of the following.  Such a loss is excluded even if another peril or event contributed concurrently or in any sequence to cause the loss.
>
> …
>
> b)    Water or damage caused by water-borne material.  Loss resulting from water or water-borne material damage described below is not covered even if other perils contributed, directly or indirectly to cause the loss. Water and water-borne material damage means:
>
> (1)    ***flood, surface water, waves, tidal waves, overflow of a body of water, spray from these, whether or not driven by wind.***

(Oct. 1, 2008 Certified Copy of Nationwide Homeowners Policy 6323 HO 003453 at NW-BAKC000252 (Ex. 4).) (*emphasis added*).  Subject to the specific terms, conditions, limits, endorsements, and exclusions in their homeowner's policy and declarations, Plaintiffs' policy provided the following coverage at the time of Hurricane Katrina: $89,600 for Coverage A-Dwelling; $8,960 for Coverage B-Other Structures; $62,720 for Coverage C-Personal Property; and $17,920 for Coverage D-Loss of Use.  (*Id.* at NW-BAKC000236.)

The policy contained a $500 deductible for damage caused by all covered perils and a 2% deductible under a Hurricane Deductible Endorsement.  (*Id.*)  Plaintiffs' Hurricane Coverage and Deductible Provision Endorsement reiterated the coverage and exclusions of the underlying policy by stating that "[c]overage under this policy includes loss or damage caused by the peril

of windstorm during a hurricane" but "coverage does not include loss caused by flooding, including but not limited to flooding resulting from high tides or storm surges." (Homeowner's Policy at NW-BAKC000239.)

On August 29, 2005, Plaintiffs' property sustained significant flood damage during Hurricane Katrina. On September 29, 2005, Nationwide adjuster Andrew Brodie met with Plaintiffs at their property. Brodie inspected the property, asked questions, and photographed the damage. (All Activity Logs at NW-BAKC000111 (Ex. 5); Nationwide Post-Katrina Photographs at NW-BAKC000132-201 (Ex. 6).) At the time they toured this structure, Plaintiffs' house was standing, visibly resting on its concrete foundation over a small crawlspace. (Post-Katrina Photographs at NW-BAKC000153, NW-BAKC000158.) Also at that time, Mr. Baker gave a recorded interview to Mr. Brodie.

Wind damage at Plaintiffs' property appeared to be relatively minor. Mr. Baker has acknowledged that there were no broken windows in his home after Hurricane Katrina (Feb. 24, 2010 Deposition of Charles Baker at 120-26 (Ex. 7); Post-Katrina Photographs at NW-BAKC000141-53), and that his "roof looked okay" after the storm absent a few missing shingles. (C. Baker Dep. at 135, 137-38; Post-Katrina Photographs at NW-BAKC000153-158.) Much like Plaintiffs' home, the small, detached garage on Plaintiffs' property was missing a few shingles on its roof, and four of the garage door panels had been displaced slightly (three of which Mr. Baker was able to push back in place). (C. Baker Dep. at 257-260.) Otherwise, the detached garage suffered no additional damage to its structure and is still in use on the property today. (C. Baker Dep. 262.)

But within Plaintiffs' house, a waterline measured at four feet divided undamaged property from far more significant storm surge flooding damage. (Post-Katrina Photographs at

NW-BAKC000167-68.)  This was consistent with Mr. Baker's observation that "[his] waterline was about four and a half feet" on the interior of his property and six feet on the exterior of his house, since his property was built over a foot and a half crawlspace.  (All Activity Log at NW-BAKC000098 (Baker interview transcript); C. Baker Dep. at 99-100).  Below that waterline, Mr. Baker described "lots of mud, and water" in the interior of his house and reported that "everything was wet."  (C. Baker Dep. at 113 (describing a "couple of inches" of mud in his house).)  Plaintiffs' floors were "buckled up" and Mrs. Baker noted that "[t]here was silt and muddy gook everywhere," with "mud and silt and all that stuff in every single room."  (A. Baker Dep. at 67, 69.)  In fact, it was obvious to her that "there had to have been water in the house or our floors wouldn't buckle" and she acknowledged that "everything was saturated."  (A. Baker Dep. at 68.)

The items above the waterline, however, were largely undamaged.  According to Mr. Baker, there were a number of "items there that . . . we were able to salvage" because "they didn't get wet, they were up above the waterline."  (All Activity Log at NW-BAKC000103 (Baker interview transcript).)  Mr. Baker described one cabinet where the crystal on the bottom shelves were destroyed when "the shelves collapsed" but acknowledged that he did "manage to salvage some of [the] china . . . up in the upper cabinet." (*Id.* at NW-BAKC000107.)

The description provided to Nationwide's adjuster during that inspection was entirely consistent with Plaintiffs' view of their property damage after Hurricane Katrina.  Nine days before Nationwide's inspection, on September 20, 2005, Mr. Baker applied for a building permit with the City of Pascagoula in which he sought permission to "gut house, and install sheetrock, flooring, trim" along with other repairs "below water mark" that he identified as 4.5 feet high. (Sept. 20, 2005 Building Permit (Ex. 8).)  By contrast, he needed to only replace "a few

shingles" on his roof. (*Id.*; C. Baker Dep. at 135-36.) Mr. Baker estimated that all of this
damage could be repaired for $30,000. (*Id.*)

After its inspection, Nationwide paid for property damage covered under the terms of
Plaintiffs' insurance policy and denied coverage for property damage caused by excluded storm
surge flooding. On October 17, 2005 Nationwide paid $4,856.53 for damage to Plaintiffs' roof
and portions of the ceiling and drywall caused by wind and wind-driven rain. (October 17, 2005
Nationwide Claim Check Copy No. 91-000740856 at NW-BAKC000216-217 (Ex. 9); October
5, 2005 Nationwide Estimate of Repairs at NW-BAKC000055-58 (Ex. 10).) In issuing this
payment, Nationwide made clear that if there was any additional property damage that had not
been inspected, Plaintiffs were obligated to notify Nationwide and make their property available
for inspection:

> Nationwide Insurance Company reserves the right to inspect and review any
> additional damages that are not specified in this estimate prior to repairs. The
> adjuster must be notified and approve in advance, the repairs of any additional
> and/or any previously unseen damage. . . . . Any repairs or improvements that are
> not specified and approved by the adjuster will be your responsibility.

(Estimate of Repairs at NW-BAKC000051.) On November 16, 2005, Nationwide sent Plaintiffs
a reservation of rights letter quoting the exclusion for flood damage that applied to a portion of
their claim, (Nov. 16, 2005 Reservation of Rights Letter at NW-BAKC000016-17 (Ex. 11)), and
on January 7, 2006, Nationwide partially denied coverage for Plaintiffs' claim for property
damage that was caused by "water or water-borne material," (Jan. 7, 2006 Partial Denial Letter
at NW-BACK00008-09 (Ex. 12).) Nationwide also invited Plaintiffs to "let us know as soon as
possible" if they become "aware of additional facts or damages which you believe Nationwide
ha[d] not had an opportunity to review and consider." (*Id.* at NW-BACK00009.)

In the process of repairing their property, Plaintiffs came to the conclusion that they
would build a new home rather than repairing their existing one. In late October or mid-

November of 2005, Plaintiffs were advised to tear down their existing home and build a new house.  (C. Baker Dep. at 220-221.)  Plaintiffs claim that they sought advice from two family friends, each of whom reported damage to the foundation underneath Plaintiffs' home.  (C. Baker Dep. 230, 255, 265.)  Jack Rogers, a local carpenter, advised Plaintiffs that their property was beyond repair.  (*Id* at 255.)  Rogers crawled into the one to two-foot crawlspace under the house and observed that the floor joists supporting the house looked "twisted a little bit," the sort of thing "[t]hat can happen with age or . . . with getting wet and not drying out properly." (Rogers Dep. at 54.)  Plaintiffs' other family friend, David Usury, was a senior account manager for a chemical and engineering services company who occasionally moonlighted as a carpenter on the weekends.  (Feb. 25, 2010 Deposition of David Usury at 12-13 (Ex. 13).)  After visiting Plaintiffs' property, Usury told Plaintiffs that if it were his home, he would have built a new house and he thought that "the house could have been rebuilt for a lesser cost or the same cost as being renovated."  (*Id.* at 44-45.)  Neither Rogers nor Usury—nor any contractor for that matter—provided Plaintiffs with an estimate of the cost of repairing the home.  (C. Baker Dep. at 267-268.)  Nor did they estimate cost of rebuilding Plaintiffs' existing home.  (*Id.*)  In addition, neither Rogers nor Usury expressed any opinion to the Bakers about whether the damage that needed repair (or reconstruction) was caused by wind or water.  (*See e.g., id.* at 255-56 (describing conversations with Rogers); *id.* at 265-66 (describing conversations with Usury); Usury Dep. at 33 ("I'm not going to make judgment was it flood or was it wind or hail.")

After talking with Rogers and Usury, Plaintiffs decided to build a new house on their property.  Plaintiffs arranged to have their house torn down by the Army Corps of Engineers in May 2006, (C. Baker Dep. at 271, 277-78), but made no effort to contact Nationwide about their plans to build a new house before their existing house was torn down.  (*Id.* at 272.)

Instead of seeking additional insurance proceeds from Nationwide, Plaintiffs applied for flood disaster assistance from the Mississippi Development Authority (MDA). (Feb. 28, 2007 Letter from MDA to C. Baker (Ex.14).) As a condition of eligibility for the MDA grant, Plaintiffs were required to, and did, represent that their property "received flood damage as a result of Hurricane Katrina." (MDA Grant Program Application.) They signed that statement having certified that "all the information on the application, documents provided and closing documents are true tobest of [applicant's] knowledge and . . . have been relied on by MDA to provide disaster assistance," that "[a]ll damages claimed were a direct result of the declared disaster," and that they could "be prosecuted by Federal, State and/or local authorities for making or filing false, misleading and/or incomplete statements and/or documents." (Nov. 7, 2006 MDA Grant Agreement (Ex. 15).) Based on these representations, Plaintiffs received payments from the MDA in December 2006 and again in February 2009 totaling $129,155.47. (Dec. 7, 2006 State of Mississippi Check No 01000446 (Ex. 16); Feb. 9, 2009 State of Mississippi Check No. 0111115952 (Ex. 17).) Plaintiffs also received a low interest loan from the U.S. Small Business Administration for up to for $198,100, (Jan. 7, 2006 SBA Loan Agreement (Ex. 18), though they only ended up using $10,000 of that loan. (C. Baker Dep. at 326.) With the money they received, Plaintiffs were able to build a new house that is almost 300 square feet larger than their previous home. (*Id.* at 334-336; MDA Elevation Project Status (Ex. 19).)

On August 26, 2008, however, Plaintiffs filed a lawsuit against Nationwide claiming that all of their damage was caused by wind during Hurricane Katrina. Plaintiffs' complaint alleges that "[o]n or about August 29, 2005 . . . the Bakers' home and personal property therein were completely destroyed by an accidental direct physical loss caused by winds." (Compl. ¶ 12.) Plaintiffs seek the coverage limits of their homeowner's policy along with punitive damages

because Nationwide partially denied coverage for their claim for property damage below the four-foot waterline.

## ARGUMENT

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Once the moving party has made an initial showing that no evidence supports the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas*, 136 F.3d at 458.  Mere conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence and, thus, are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).  If the nonmoving party fails to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex* 477 U.S. at 322-23.

I.    **PLAINTIFFS ARE NOT ENTITLED TO COVERAGE FOR UNCOMPENSATED PROPERTY DAMAGE UNDER THEIR HOMEOWNER'S INSURANCE POLICY.**

Summary judgment is warranted in this case because there is no evidence from which a reasonable, fair-minded jury could conclude that the property damage at issue is covered under the terms and conditions of the insurance policy. Plaintiffs seek the full limits of their policy for coverages A-D based on a claim for breach of contract. (Compl. ¶¶ 28-31; May 29, 2009 Pls.' Answers to Def.'s 1st Interrogs. Response to Interrog. No. 18 (Ex. 20)). [1] But for Plaintiffs' claims to reach a jury, there must be evidence from which a jury can reasonably conclude not just that Plaintiffs' property was beyond repair after Hurricane Katrina, but that it was not repairable ***because of wind damage***.

A.    **There is No Evidence of Wind Damage To Plaintiffs' Property Beyond the $4,856.53 They Received.**

Plaintiffs have failed to provide any evidence that would allow a reasonable jury to determine that they have suffered an uncompensated, covered loss — property damage caused by

---

[1]    All of Plaintiffs' claims focus on the question of whether Nationwide properly issued a partial denial for coverage for property damage caused by storm surge flooding during Katrina. Plaintiffs assert claims that Nationwide breached its insurance contract by denying coverage for flood damage because "Plaintiffs' loss was caused by a hurricane wind," (*Compl.* ¶ 30), that Nationwide "waived its right to exclude any part of the loss" under the flood exclusions of policy, (*id.* at ¶ 32), that Nationwide was negligent or grossly negligent in handling Plaintiffs' claim by denying coverage for flooding, (*id.* at ¶¶ 35-36), that Nationwide denied coverage for flooding in bad faith, (*id.* at ¶ 38), and did so fraudulently, (*id.* at ¶ 54), and committed fraud by selling Plaintiffs a policy that excluded coverage for storm surge flooding during hurricanes, (*id.* at ¶ 55). Thus, all claims can be dismissed as a matter of law if Nationwide properly denied coverage for flooding.

To the extent that Plaintiffs' claims assert causes of action arising from pre-storm conduct, Nationwide is following this Court's lead in addressing claims separately in Section 2. *See* Feb. 25, 2009 Mem. Op. on Mot. for Partial Summ. J., *Remel v. State Farm Fire & Cas. Co.*, No. 1:07cv126 LTS-RHW (S.D. Miss.) (granting summary judgment on pre-storm conduct)

To the extent that Plaintiffs assert claims accusing Nationwide of denying coverage in bad faith, fraudulently, or tortuously during the claims adjusting process, (*e.g.*, Compl. ¶ 35), these claims derive from Plaintiffs' contention that Nationwide adjusted and denied their claim for insurance coverage in bad faith and can be dismissed for the reasons set forth in Section 3.

wind other than the $4,856.53 for their roof and ceilings that Nationwide has already paid. Indeed, the evidence related to the property damage that occurred on August 29, 2005 indicates that Plaintiffs' property sustained significant storm surge flooding damage and minor wind damage to Plaintiffs' roof:

- There was a visible, four and a half foot waterline on the interior of Plaintiffs' home. (Post-Katrina Photographs at NW-BAKC000167-68.)   Mr. Baker described this visible four-foot waterline throughout the interior of his home.  (All Activity Logs at NW-BAKC000098 (Baker interview transcript); Baker, C. Baker Dep. 99-100.)

- Mr. Baker applied for a building permit nine days before the Nationwide inspection to "gut house, and install sheetrock, flooring, trim" along with other repairs "below water mark" that he identified as 4.5 feet high.  (Building Permit.)

- Plaintiffs' expert accepts that storm surge flooding reached six feet above the ground at Plaintiffs' residence.  (Mar. 1, 2010 Deposition of Ted Biddy at 192 (Ex. 21).)

- Below that waterline, Mr. Baker described "lots of mud, and water" in the interior of his house and noted that "everything was wet." (All Activity Logs at NW-BAKC000048 (Baker interview transcript).)  *See* C. Baker Dep. at 88 (Q: Did you see evidence that there had been water during the course of the storm? A. There was no water. There was mud.").)

- Plaintiffs' floors were 'buckled up" and "[t]here was silt and muddy gook everywhere," with "mud and silt and all that stuff in every single room."  (A. Baker Dep. at 67, 69.)  It was obvious that "there had to have been water in the house or our floors wouldn't buckle" and "everything was saturated."  (*Id.*. at 68.)

- Mr. Baker identified the waterline as dividing damaged from non-damaged property. He described "items there that . . . we were able to salvage" because "they didn't get wet, they were up above the waterline."  (All Activity Logs. at NW-BAKC000103 (Baker interview transcript).)  He even described one cabinet where the crystal on the bottom shelves were destroyed when "the shelves collapsed" but that he did "manage to salvage some of our china . . . in the upper cabinet."  *Id.*, at NW-BAKC000107.)

- There were no broken windows on Plaintiffs' property after Hurricane Katrina. C. Baker Dep. at 120-26, 128-29.  *See also, e.g.*, Post-Katrina Photographs at NW-BAKC000142-43),

- Plaintiffs' "roof looked okay" after Katrina absent a few missing shingles (C. Baker Dep. 135, 137-38.  *See also, e.g.*, Post-Katrina Photographs at NW-BAKC000153-158.)  In the building permit he submitted before Nationwide's inspection, Baker stated that he needed to only replace "a few shingles" on his roof.  (Building Permit.)

- Expert testimony regarding the weather conditions at Plaintiffs' property is undisputed, and establishes that Plaintiffs' property was subjected to only 80 mph sustained wind speeds and 17.7 feet of water above NAVD88, or about 4.7 to 5.7

feet above the level of the floor, for about 4 hours. (May 1, 2010 KKAI Meteorological Analysis of Hurricane Katrina Wind and Storm Tide (Ex. 22).)

- Satellite imagery of the Gulf Coast shortly after the storm shows that houses closer to the shoreline, where the waves were more violent, sustained significant damage; the farther away homes were from the shoreline, the less damage the homes sustained. (Apr. 23, 2009 James Skees Residential Hurricane Damage Evaluation at 6 (Ex. 23).)

- Satellite and adjuster photographs of Plaintiffs' property, along with other houses on Shepherd Avenue, show no evidence of wind damage to the exposed roofs, aside from a few missing shingles. (*Id.* at 6.)

- Plaintiffs' garage did not sustain any significant damage to its roof, siding, and windows. (*Id.* at 18.)

- Plaintiffs' garage also did not show any signs of foundational displacement. (*Id.* at 16-17.) It remained fully intact on the concrete slab to which it was attached with only nails in the concrete, and its framing walls were undisturbed (*id.* at 17, 19, 21), indicating that wind damage would not have displaced the main structure. (*Id.* at 17-19.)

- Another small shed to the southeast of Plaintiffs' property remained intact during Katrina, in its proper position indicating that winds were not very strong. (*Id.* at 21.)

Although there have been conflicting opinions about the application of the "anti-concurrent cause" provision to deny coverage for property damage from Hurricane Katrina, courts have not questioned denials of coverage for flood damage under the standard flood exclusion. *See Leonard v. Nationwide Mut. Ins. Co.*, 438 F. Supp. 2d 684, 694 (S.D. Miss. 2006) ("The provisions of the Nationwide policy that exclude coverage for damages caused by water are valid and enforceable terms of the insurance contract."), aff'd., 199F.3d 419 (5th Cir. 2007), *cert. denied*, 128 S.Ct. 1873 (2008); *Leonard,* at 430 ("Courts have interpreted water-damage exclusions like the one found in the Leonards' policy to encompass the peril of wind-driven inundation by water, or storm surge, for ages."); *Corban v. United Services Auto. Ass'n,*, 20 So. 3d. 601 (Miss. 2009) ("This Court finds that 'storm surge' is plainly encompassed within the 'flood' or 'overflow of a body of water' portions of the 'water damage' definition, and no other 'logical interpretation' exists.") (citations, quotations omitted). As in *Leonard*, Nationwide's

payment of $4,856.53 of identifiable wind damage sustained by the standing structure it examined, and Nationwide's denial of coverage for damage below the visible waterline, was entirely proper.  *See Leonard*, 438 F. Supp. 2d at 696 (finding that excluding coverage for the expense of cleaning the exterior of the home below the waterline under the flood exclusions to be proper).

In the face of this apparently undisputed evidence of flood damage, Plaintiffs offer the expert opinion of Ted Biddy, who opines that all damage to Plaintiffs' property — even damage to contents and property below the visible waterline — is attributable to wind.  This is because, in Biddy's view, the elevation of this house changed during Hurricane Katrina.

> ***The entire house was moved slightly off its foundations by the early winds*** of the storm, and most all of the foundation piers and many of the floor support beams were destroyed.  Much of ***the floor system fell down to the ground level.*** Secondly, the later arriving storm waters at 11 AM flowed under the house and came up a maximum of 3.5 to 4 feet of water above the lowered floor level and caused destruction of most items touched by the salt water.
>
> \* \* \*
>
> ***The storm's high water*** did no structural damage to this building and ***would not have entered the building except in seepage areas, without the earlier winds blowing the structure slightly to the northwest and destroying the foundations and floor support beams and lowering the floor level***.  It would have been impossible for the storm's waters to have moved the house and to have caused the destruction of the foundations and floor support system, because the original floor level elevation was at 16 feet while the high water level was only at elevation 17 to 18 feet.

(Apr. 11, 2007 Forensic Eng'g Study of Damages by Ted L. Biddy at 15-16 ("Biddy Report") (Ex. 24).)  Based on this theory that the wind moved their home off its foundation and it "fell down to ground level," thus allowing water to reach four feet — Biddy concludes that the "root cause of all of the structural destruction . . .  was the early winds of Hurricane Katrina."  (*Id.* at 30.)

13

This theory is wholly divorced from the realities of the evidence in this case. Biddy erroneously based his conclusions on an elevation certificate that was prepared *after Hurricane Katrina from construction drawings of the Plaintiffs' new house*. (Biddy Dep. at 201-202; *see* May 3, 2006 Elevation Certificate (Ex. 25).) He incorrectly assumed that the elevation of the new house was the same as the elevation of the house demolished by Plaintiffs. (Biddy Dep. at 201.) In fact, the new construction is significantly higher. While Plaintiffs' new home sits elevated several feet in the air, their old home did not:

| Pre-Katrina Home: | Post-Katrina Home: |
|:---:|:---:|

 

(*See* Pre-Storm Nationwide Photographs of Baker Residence at NW-BAKC0003163-67 (Ex. 26); Skees Report at Attachment A.) Biddy's theory was that a house elevated as high as Plaintiffs' post-Katrina house was blown down to the level that their pre-Katrina house already occupied.

And Biddy has essentially acknowledged the problems with his "elevation drop" theory. When shown a picture of the newly constructed Baker residence, even Biddy was forced to admit that the new construction was "[c]onsiderably higher" than the structure that existed at the time of Hurricane Katrina. (Biddy Dep. at 203.) So Biddy was forced to admit that relying on the post-storm elevation certificate caused his report to contain calculation errors. (*Id.* at 205; Enlargement of Pre-Storm Photographs of Baker Residence at NW-BAKC0003163 (Ex. 27).) Finally, when Biddy was shown photos comparing Plaintiffs' house before and after Katrina,

*Biddy himself could find nothing in those photos to support his theory that the elevation of Plaintiffs' property changed during Hurricane Katrina*. (*Id.* at 226. *Compare* Enlargement of Pre-Storm Photographs of Baker Residence at NW-BAKC0003163 *with* Sept. 29, 2005 Nationwide Photograph at NW-BAKC000153 (Ex. 28).)

In actuality, Biddy's post-hac elevation-drop speculation contravenes all of the plain undisputable evidence of this case. Because this house survived Katrina, the direct evidence demonstrates that Plaintiffs' house did not "fall to the ground" into Hurricane Katrina's storm surge flood waters:

- A comparison of pre-storm and post-storm photos of Plaintiffs' property shows that that the elevation of this house did not change during Hurricane Katrina. *Compare* Enlargement of Pre-Storm Photographs of Baker Residence at NW-BAKC0003163 *with* Sept. 29, 2005 Nationwide Photograph at NW-BAKC000153.)

- Mr. Baker noted after the storm that the waterline on his property was approximately four and a half feet on the interior of his property and six feet on the exterior of his house, since his property was elevated "above the ground about a foot and a half." (All Activity Logs at NW-BAKC000098 (Baker interview transcript); C. Baker Dep. at 99-100).)

- Mr. Baker told Mr. Biddy that "there was six feet of water at his property, and this house was two feet off the ground, so it was four feet inside," because of that crawlspace. (Biddy Dep. at 191.) Mr. Biddy chose to disregard Mr. Baker on that point. (*Id.* at 191.)

- Post-storm photographs show Plaintiffs' property visibly resting on its concrete foundation piers. Post-Katrina Photographs at NW-BAKC000158.)

- Jack Rogers crawled into the crawlspace under Plaintiffs' property to look at the foundation. (Rogers Dep. at 54.) He could not have done so had this property "fallen to ground level."

Biddy's speculative elevation-drop theory so misconstrues the evidence of this case that Nationwide has moved this Court to strike it as unreliable and irrelevant. And this Court should also find that there is no genuine dispute based on the evidence that Plaintiffs' property changed elevation during Hurricane Katrina. Without that theory, the four-foot water mark in Plaintiffs' property left an undisputed point where four feet of hurricane storm surge flooding rose to cause

property damage to Plaintiffs' house and contents.  And there is nothing to indicate that damage below that point was caused by wind.

Nor can Plaintiffs argue that the property damage that prompted them to remove their existing house and build a new one was somehow caused by wind damage.  If anything, those witnesses stated the exact opposite.  Jack Rogers, who Plaintiffs claim advised them that their house needed to be torn down, went into the crawlspace under the elevated house and described that "[i]t looked like some of the timbers that — floor joists and stuff sitting on it looked like to me it might have been some of them twisted a little bit."  (Rogers Dep. at 54.)  Mr. Rogers suggested that this was the sort of thing "[t]hat can happen with age or it can happen with getting wet and not drying out properly."  (*Id.*)  Rogers offered no explanation for how twisting of floor joists underneath a house would be caused by wind.  David Usury — another family friend who Plaintiffs only identified as a witness after Mr. Rogers gave his testimony — studiously avoided offering any opinion about whether Plaintiffs' property damage was caused by wind or water.  (Usury Dep. at 33-34.)  He repeatedly stated that "I'm not going to make judgment was it flood or was it wind or hail" because he testified that he had no opinion on that issue.  (*Id.* at 33.)

Moreover, Plaintiffs' own admissions after the storm preclude them from pursuing any claim that their "home and personal property therein were completely destroyed by an accidental direct physical loss caused by winds," (Compl. ¶ 12), or that the "root cause of all of the structural destruction . . .  was the early winds of Hurricane Katrina," (Biddy Report at 30).  Plaintiffs sought and received $129,155.47 in flood disaster relief from the Mississippi Development Authority based their representation that their home received flood damage as a result of Hurricane Katrina.  (MDA Flood Grant App.; Check No. 010004446; A. Baker Dep. at 199-201.)  MDA flood grants are provided "for people who owned homes located outside the

16

federally designated flood zone, yet still suffered structural flood damage caused by Hurricane Katrina." (MDA Katrina Homeowner Grant Application Guidebook at 1, *available at* http:/mshomehelp.gov/pressrelease.htm.) In order to qualify for this grant, homes must have ***"suffered flood damage as a result of Hurricane Katrina."*** (*Id.*) Plaintiffs acknowledge, as their signed Flood Elevation Grant Program Application shows, that flood damage to one's property was a prerequisite to obtaining this grant. (A. Baker Dep. at 213.)

Because "[t]he purpose of the [MDA flood] grant is to provide financial assistance to homeowners who … received flood damage to their home," and because "a homeowner must certify that his property sustained flood damage," it is well-settled that "by applying for and receiving an MDA grant the homeowner makes a judicial admission that the insured property has sustained some amount of flood damage." *Dickinson v. Nationwide Mut. Fire Ins. Co.*, No. 1:06CV198-LTS-RHW, 2008 WL 941783, at *6, *7 (S.D. Miss Apr. 4, 2008). This judicial admission precludes the homeowner from offering evidence, testimony, or argument that her home was destroyed solely by wind. *See Dickinson v. Nationwide Mut. Fire Ins. Co.*, No. 1:06CV198-LTS-RHW, 2008 WL 2568140, at *1 (S.D. Miss. Jun. 24, 2008) (granting Nationwide's motion to exclude evidence, testimony, or argument that Plaintiffs' property was destroyed solely by wind). "Simply put … Plaintiff may not reap the benefits of the MDA program designed to assist those outside the flood zone who suffered flood damage, and then urge that he did not qualify for them" in litigation. *Schmermund v. Nationwide Mutual Ins. Co.*, No. 1:07CV1213-LTS-RHW, 2008 WL 5169396, at *2 (S.D. Miss. Dec. 5, 2008)

Plaintiffs' policy unambiguously excludes from coverage damage caused by water-borne material, including "flood, surface water, waves, tidal waves," and "overflow of a body of water . . . whether or not driven by wind." (Homeowners Policy at NW-BAKC000252.) Plaintiffs'

claim was paid in part (for wind damage) and denied in part (for flood damage) pursuant to the clear, unambiguous and routinely enforced policy terms excluding coverage for storm surge flooding. Plaintiffs' attempt to offer evidence, through Mr. Biddy, that all of their damage — including damages below the four-foot waterline — was actually caused by wind erroneously relied on an "elevation drop" theory that bears no relation to the evidence. And this theory would be foreclosed in any event by Plaintiffs' judicial admission contained within their MDA grand application. There is no evidence from which a reasonable, fair-minded jury could conclude that Nationwide improperly denied coverage for property damage below that undisputed water line. Nationwide is entitled to summary judgment as a result.

> **B.      Plaintiffs Are Not Entitled To Coverage For "Other Structures" Under Coverage B.**

Plaintiffs also claim the limits of Coverage B for other structures of their property. (Pl.'s Resp. to Def.'s Interrog. No. 18.) But Nationwide is entitled to summary judgment on this claim as well. Much like Plaintiffs' home, the small, detached garage on Plaintiffs' property was missing a few shingles on its roof, and a few panels had been displaced on the garage door. (C. Baker Dep. at 257-260.) Otherwise, the detached garage suffered no additional damage to its structure and is still in use on the property today. (C. Baker Dep. at 262.) Nationwide paid Plaintiffs for identifiable wind damage to Plaintiffs' garage and fence. (Estimate of Repairs at NW-BAKC000053.) Nationwide denied coverage for storm surge flooding damage based on the terms of Plaintiffs' policy. Plaintiffs have not presented any evidence supporting a claim for unpaid damage to the garage. As a result, any claims under Coverage B fail as a matter of law.

> **C.      Plaintiffs Are Not Entitled To Coverage Or Recovery For "Personal Property" Under Coverage C.**

Plaintiffs argue that they should recover the limits of their coverage for personal property under Coverage C of their Homeowners Policy for damage to their personal property. (Pl.'s

Resp. to Def.'s Interrog. No. 18.)  Plaintiffs' homeowner's policy only provides coverage for "direct physical loss to property described in Coverage C caused by" certain named perils such as "windstorm."  (Homeowners Policy at NW-BAKC000250.)  This language requires that the policyholder show there was "a direct physical loss caused by one of the perils enumerated in the policy" for coverage.  *Leonard*, 438 F. Supp. 2d at 694.  So Plaintiffs' failure of proof in this case is all the more pronounced for their claim for coverage for their contents.

Judgment as a matter of law should issue for this claim as well for the same reasons as under Coverage A.  Like Coverage A, this coverage is subject to the exclusions in the policy, such as the exclusions for flood damage.  (Homeowners Policy at NW-BAKC000252.)  And the evidence is just as compelling.  Plaintiffs compiled a list of their contents, including, for example, all of their stemware and china.  (Pls.' Contents List (Ex. 29).)  Yet Mr. Baker was clear that the only items that were damaged were below the four-foot waterline in his home.  He described "items . . .  that we were able to salvage" because "they didn't get wet, they were up above the waterline."  (All Activity Logs at NW-BAKC000103 (Baker interview transcript).)  He even explained that items in the same cabinet were destroyed below the waterline when "the . . . shelves collapsed" but that he was able "to salvage some of our china . . . up in the upper cabinet."  (*Id.* at NW-BAKC000105.)  The same evidence of flood damage that precludes recovery under Coverage A extinguishes Plaintiffs' claims under Coverage C, and Nationwide is also entitled to summary judgment for this coverage as a result.

### D.    Plaintiffs Are Not Entitled To Coverage Or Recovery For "Additional Living Expenses" Under Coverage D.

Plaintiffs also appear to seek the full policy limits for "Loss of Use" under Coverage D. (Pl.'s Resp. to Def.'s Interrog. No. 18.)  Plaintiffs' policy states:

> "If a **covered loss** requires you to leave the residence premises, we will pay the required increase **in living expenses you incur** to maintain your normal standard

of living.  Payment will be for the shortest time required to repair or replace the premises; or, if you permanently relocate, for the shortest time required for your household to settle elsewhere."

(Homeowners Policy at NW-BAKC000246.)

Plaintiffs are not entitled to any payment for loss of use.  There is no evidence from which a jury could conclude that Plaintiffs' home was rendered uninhabitable *by a covered loss*. *See infra* Part I.A.  Moreover, the only expenses Plaintiffs incurred were never presented to Nationwide.  There is no dispute that Plaintiff, Mrs. Baker, lived with her sister in the interim and was not charged any rent.  (A. Baker Dep. 74.)  Plaintiffs provided no receipts of living expenses to Nationwide during the claims adjustment process, nor were they produced in litigation even though Plaintiffs were obligated to do so.  *See* Fed. R. Civ. P. 26(a)(1)(A)(iii) (requiring "a computation of each category of damages" and the "documents or other evidentiary material … on which each computation is based").  *See also* Dec. 2, 2008 Nationwide 1st Reqs. Prod. Docs. Def.'s Request for Prod. No. 16 (Ex. 30).)

Because Plaintiffs cannot identify any "specific evidence in the record … to articulate the precise manner in which that evidence supports [their] claim" to compensation for additional living expenses, *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998), Nationwide is entitled to summary judgment on the demand for additional living expenses as well.  *See* Order Granting Mot. *in Limine* to Exclude Evidence in Supp. of Pls.' Claim for Debris Removal Expenses at 2, *Dickinson v. Nationwide Mutual Fire Ins. Co.*, No. 1:06CV198-LTS-RHW (S.D. Miss. June 24, 2008) [Dkt. 224]; Order Granting Mot. *in Limine* to Exclude Evidence in Supp. of Pls.' Claim for Additional Living Expenses at 2, *Dickinson* [Dkt. 223].

II.    **PLAINTIFF'S CLAIMS FOR FRAUDULENT INDUCEMENT ARE DEFICIENT AND TIME-BARRED AS A MATTER OF LAW.**

Plaintiffs also asserts claims to have been "fraudulently induced" to purchase their policy based on alleged misrepresentations made when they purchased their policy in 1998. (Compl.¶ 55-56.)   At their depositions, Plaintiffs admitted that the alleged misrepresentations were that they did not need to purchase flood insurance since their property was not in a flood zone and that they were receiving "a good policy" and "good coverage."  (C. Baker Dep. at 37; A. Baker Dep. at 33.)  Plaintiffs admit receiving their policy and reading portions of their policy at that time.  (A. Baker Dep. at 34.)

These precise claims have been rejected as a matter of law repeatedly by this Court and others.  In *Leonard v. Nationwide Mutual Insurance Co.*, 499 F.3d 419, 439 (5th Cir. 2007), Plaintiffs also claimed that their agent "assured [the policyholder] that all hurricane damage was covered" and "that he did not need to purchase additional flood insurance."  The Fifth Circuit ruled that the plaintiffs in that case "fail[ed] to present an actionable claim of negligent misrepresentation" under Mississippi law because their "reliance on [their agent's] statements was objectively unreasonable in light of the policy language clearly" contradicting the alleged misrepresentation – policy language that was "imputed to [the policyholder] under state law" even if the policy had not been read.  *Id.* at 440.

This is in keeping with well-settled Mississippi law that an insured will not be heard to complain of misrepresentations where the alleged deficiency in the policy was fully and fairly disclosed and the insured has ample time to correct the issue.  *Atlas Roofing Mfg. Co. v. Robinson & Julienne, Inc.*, 279 So. 2d 625, 629 (Miss. 1973).  When insureds, like Plaintiffs, "accept[] an insurance policy for a reasonable amount of time and make[] no complaint about the coverage, the insured[s are] bound by the provisions of the policy."  *Reed v. American Med. Sec.*

*Group, Inc.*, 324 F. Supp. 2d 798, 802 (S.D. Miss. 2004) (citing *Atlas Roofing*, 279 So. 2d at 625). Put simply, where an insurance policy plainly says one thing, and an agent allegedly says the contrary, it is the written document that controls. *See, e.g., Hutton v. American Gen. Life & Accident Ins. Co.*, 909 So. 2d 87, 95 (Miss. Ct. App. 2005); *Smith v. Nationwide Ins. Co.*, No. 1:08CV683-LTS-RHW, 2009 WL 736199, at *3 (S.D. Miss Mar. 18, 2009); *Campbell v. State Farm Fire & Cas. Co.*, No. 1:07CV395-LTS-RHW, 2008 WL 2389746, at *2 (S.D. Miss. June 10, 2008); *Gibson v. Markel Int'l, Ltd.*, No. 1:07CV1245HSO-JMR, 2008 WL 3842977, at *4 (S.D. Miss. Aug. 14, 2008). This ensures that "[t]he risks the policy covers are defined by the terms of the policy itself, not by inferences made by the insured or general representations concerning the scope of coverage made by the agent." *Smith*, 2009 WL 736199, at *2.

But Plaintiff's claims are not only legally deficient, but time-barred as well. Plaintiff filed her lawsuit in 2008, yet complains about "inducement" that occurred when they purchased their policies and when they received and partially read their policies in 1998. (A. Baker Dep. at 34; Compl. ¶ 55-56.)

Claims of negligence and misrepresentation are governed by a three-year catch-all statute of limitations under Mississippi law. *See* Miss. Code. Ann. § 15-1-49; *see also Carter v. Citigroup Inc.*, 938 So. 2d 809, 811 (Miss. 2006); *Andrus v. Ellis*, 887 So. 2d 175, 179 (Miss. 2004). Such claims accrue when policyholders have constructive or actual notice of their claim and accrual can be triggered by receipt of an insurance policy or a letter denying coverage. *See Weathers v. Metropolitan Life Ins. Co.*, 14 So.3d 688, 694 (Miss. 2009); *Young v. Southern Farm Bureau Life Ins., Co.*, 592 So. 2d 103, 107 (Miss. 1991) (en banc) (denial letter); *Carter*, 938 So.2d at 818 (loan documents). Whether that document puts the policyholder on notice is an issue of law for the Court to decide. *See, e.g., American Bankers' Ins. Co. of Fla. v. Wells*, 819

So. 2d 1196, 1202 (Miss. 2001) (en banc) (finding trial court should have granted a motion to dismiss because "the Certificates of Insurance gave adequate notice of the backdating and that a reasonable person would have known of the backdating at the time of the receipt of the Certificates"); *Andrus v. Ellis*, 887 So. 2d 175, 180 (Miss. 2004) (finding plaintiffs put on notice by "the unambiguous language of the loan agreement").

Here, too, the Fifth Circuit's opinion in *Leonard* disposes of Plaintiff's claims.    In *Leonard,* the Fifth Circuit held the exclusions in Nationwide's policy to be clear, unambiguous and enforceable by their terms.  *Leonard*, 499 F.3d at 430-31.  These terms put the insureds on notice that their coverage did not include flood insurance, and rendered their post-loss claims of misrepresentation to be "stale," since the "claim accrued at the time the misrepresentation was made."    *Id.* at 440.    Thus, "[a]ny claim [a policyholder] might have had for negligent misrepresentation [i]s time barred three years from the time the representation was made." *Campbell*, 2008 WL 2389746 at *2.  The same reasoning applies here, and Plaintiffs' claims related to alleged misrepresentations must be rejected as a matter of law for the same reasons.

## III.    PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES.

Plaintiffs allege that Nationwide acted with gross negligence "and/or callous disregard for the rights of the Bakers" in denying Plaintiffs' insurance claim. (*See, e.g.*, Compl. ¶ 59). Mere boilerplate bad faith allegations, however, do not entitle Plaintiffs to put the question of punitive damages to the jury.  There must be evidence to support these allegations.  And in this case, the record is devoid of evidence that would permit the Court to put the question of bad faith punitive damages to a jury and this Court must grant summary judgment as a result.

### A.    Plaintiffs Bear A "Heavy Burden" In Substantiating Claims For Bad Faith and Punitive Damages.

"Mississippi law does not favor punitive damages; they are considered an extraordinary remedy and allowed with caution and within narrow limits." *Dauro v. Allstate Ins. Co.*, No. 1:00CV138RO, 2003 WL 22225579, at *5 (S.D. Miss. Sept. 17, 2003), *aff'd*, 114 Fed. App'x 130 (5th Cir. 2004). A claim for punitive damages due to bad faith "will not go to the jury unless (1) there is a finding that the insurance company had no 'legitimate or arguable reason to deny payment of the claim,' and (2) the Plaintiff has made a 'showing of malice, gross negligence, or wanton disregard of the rights of the insured.'" *Sentinel Indus. Contracting Corp. v. Kimmins Indus. Serv. Corp.*, 743 So. 2d 954, 972 (Miss. 1999) (citation omitted). This reflects the judgment that Plaintiffs are not entitled to put the issue of punitive damages to the jury as a matter of course:

> [T]here is a heavy burden to be borne by the plaintiff in demonstrating to the judge in the lower court that there was no "reasonably arguable reason" for denying the claim. … If the plaintiff does not meet this burden, the trial court, must as a matter of law, remove any claim for punitive damages based on bad faith from consideration by the jury.

*Murphree v. Federal Ins. Co.*, 707 So. 2d 523, 530 (Miss. 1997) (citation omitted) Because "punitive damages will not lie" if an insurer had a "legitimate reason or *arguable reason*" for denying a claim, "the trial judge has the responsibility of making the determination of whether there was an arguably reasonable basis, either legal or factual, for denying the claim." *Blue Cross & Blue Shield of Miss., Inc. v. Campbell*, 466 So. 2d 833, 842 (Miss. 1984) (emphasis in original)

The Fifth Circuit and this Court have made clear that Hurricane Katrina claimants are subject to the same rule of law that any other litigant faces when seeking this extraordinary remedy. *See Broussard v. State Farm Fire & Cas. Co.*, 523 F.3d 618, 628-30 (5th Cir. 2008). Under Mississippi law "the trial court is responsible for reviewing all evidence before it in order to ascertain whether the jury should be permitted to decide the issues of punitive damages." *Id.*

at 627.  In undertaking this review, the trial court must bear in mind that policyholders are required to establish any entitlement to punitive damages by "clear and convincing evidence," while the insurer "need only show that it had reasonable justifications, either in fact or in law, to deny payment" — a showing that "is an issue of law for the court" to decide.  *Id.* at 628.  Where there is a "legitimate dispute over cause and the amount of covered damages sustained by Plaintiff," and where "[t]here is no substantial evidence that [the insurer] was attempting to improperly exclude wind as a cause," punitive damages are inappropriate as a matter of law. *Gunn v. Lexington Ins. Co.*, No. 1:07CV478, 2008 WL 2039543, at *3 (S.D. Miss. May 12, 2008); *see also Legacy Condos, Inc. v. Landmark Am. Ins. Co.*, No. 1:06CV1108-KS-MTP, 2008 WL 80373, at *5 n.4 (S.D. Miss. Jan. 4, 2008).

### B.    Nationwide Was Not Reckless, And Did Not Act Intentionally Or With Bad Faith Regarding Plaintiffs' Rights In Adjusting Plaintiffs' Claim.

Nationwide unquestionably had a factually and legally legitimate and arguable reason for its adjustment and denial of Plaintiffs' claim.  Here, "the evidence indicates that [Nationwide] made several attempts to learn what physical damage was due to a covered event, as well as determine what physical damage was due to an excluded peril."  *Gunn*, 2008 WL 2039543, at *3. Nationwide's adjuster inspected the property and properly reserved its rights to deny coverage pending an investigation into whether the loss was caused by an excluded peril.  After an investigation, Nationwide paid Plaintiffs $4,856.53 for damages that could be identified as caused by wind or wind driven rain to the roof and ceiling.  Nationwide denied coverage for Plaintiffs' other damage below the four-foot waterline as being caused by storm surge flooding. Plaintiffs did not dispute this assessment at the time, and when they found damage under their home, they applied for flood damage assistance and built a new house.  Only long after that point did they contend in litigation that their damage was supposedly wind-related.

Plaintiffs' own conduct in this case precludes any award of bad faith here. Mississippi law does not impose punitive damages where insured are responsible for hampering the investigation into their own claims. *See Cherry v. Anthony, Gibbs, Sage*, 501 So. 2d 416, 420 (Miss. 1987) ("[I]t is difficult to see how the insurance adjuster can be faulted for bad faith when it is clear that the [plaintiff] did not cooperate with him in his investigation."); *see also Pilate v. American Federated Ins. Co.*, 865 So. 2d 387, 397 (Miss. Ct. App. 2004) (finding no bad faith could be attributed to period of time where "[a]ny delay ... was caused not by [insurer] but by [plaintiff] or his counsel"). Plaintiffs received notice from Nationwide when it issued its payment to them, (C. Baker Dep. at 214), that told them that Nationwide had "the right to inspect and review any additional damages that are not specified in this estimate prior to repairs" and that "[t]he adjuster must be notified and approve in advance, the repairs of any additional or any previously unseen damage." (Estimate of Repairs at NW-BAKC000051.) If Nationwide was not notified, "[a]ny repairs or improvements that [were] not specified and approved by the adjuster [became Plaintiffs'] responsibility." (*Id.*) This could hardly be surprising to Plaintiffs. Indeed, even without reference to this specific notice, Plaintiffs considered it "obvious" why they would need to allow Nationwide to look at property damage before they would expect Nationwide would pay for it. (C. Baker Dep. at 214.) Plaintiffs decided that to build a new house rather than repair their existing property. (C. Baker Dep. at 271.) They claim that they made this decision because of additional foundation damage but they frankly acknowledge that they neither informed nor sought approval from Nationwide before making the decision and that Nationwide never inspected the damage that they claim rendered their home irreparable. (A. Baker Dep. 151-52; C. Baker Dep. at 272.) This Court cannot allow punitive damages to be

imposed on Nationwide for failing to pay plaintiffs to rebuild their home, when Nationwide was only made aware that it the home had been demolished *after the fact*.

Nationwide denied Plaintiffs' claims based on unambiguous policy terms that have been upheld by the Courts along with "credible evidence that support[ed] [Nationwide's] conclusions on the basis of which [Nationwide] act[ed].'" *Legacy Condos*, 2008 WL 80373, at *5 n.4 (quoting *Campbell*, 466 So. 2d at 851). Because Nationwide had a legitimate and arguable reason to deny coverage, the Court "must as a matter of law, remove any claim for punitive damages based on bad faith" from the jury's consideration. *Murphree*, 707 So. 2d at 530 (citation omitted); *see also Legacy Condos*, *Inc.,* 2008 WL 80373, at *5 (holding that "[i]f the insurer had an arguable reason to deny coverage, punitive damages are impermissible") (citation omitted).

## CONCLUSION

For the foregoing reasons, Nationwide respectfully requests that this Court grant its Motion for Summary Judgment.

Respectfully submitted,

NATIONWIDE MUTUAL FIRE INSURANCE
COMPANY, DEFENDANT

By Their Attorneys
WATKINS LUDLAM WINTER & STENNIS, P.A.

By:  /s/_____

H. Mitchell Cowan (MSB No.7734)
Laura Limerick Gibbes (MSB No. 8905)
F. Hall Bailey (MSB No. 1688)
Janet D. McMurtray (MSB No. 2774)
Christopher R. Shaw (MSB No. 100393)
Laura L. Hill (MSB No. 102247)
WATKINS LUDLAM WINTER & STENNIS, P.A.
190 East Capitol Street, Suite 800 (39201)
Post Office Box 427

Jackson, MS  39205
Telephone: (601) 949-4900
Facsimile: (601) 949-4804

Of Counsel:
Daniel F. Attridge, P.C. (Bar No. 44644)
Thomas A. Clare (Bar No. 44718)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC  20005
(202) 879-5000 (Telephone)
(202) 879-5200 (Facsimile)

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically filed the foregoing with the Clerk of the

Court using the ECF system which sent notification of such filing to the following:

      Charles R. McRae
      P.O. Box 33
      Jackson, MS 39205
      601-906-1008
      Email: crmcrae@bellsouth.net

This the ____th day of March, 2010.

             By:    */s/ F. Hall Bailey*
                     F. Hall Bailey
                     hallbailey@watkinsludlam.com